UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.



| | |
|---|---|
| WALTER STICKLE, ANTHONY CALIENDO, JOHN PITINGOLO, and DANIEL FISHER,<br>Plaintiffs<br><br>v.<br><br>ARTHUR ORFANOS,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

The plaintiffs in this case are members of a music band called "Pink Voyd". The defendant has had no involvement whatsoever with forming the band Pink Voyd, nor has he contributed to the content of, or even appeared at, any of the band's performances. This action is necessary to halt the defendant's wrongful and malicious actions in palming off the plaintiffs' band name, and publishing false and misleading statements to others in the music industry that he owns, or is a part of, Pink Voyd. This action is also filed to stop the defendant's continuing, vindictive campaign to interfere with the plaintiffs' business relationships, have Pink Voyd concerts cancelled, discredit the plaintiffs, and otherwise cause damage to the plaintiffs.

As set forth below, the defendants' conduct violates the Lanham Act, the Massachusetts Protection of Trademarks Act, M.G.L. c. 93A, and common laws against product disparagement, unfair competition, and tortious interference with business relationships. The plaintiffs stand to be irreparably harmed, and can

demonstrate a likelihood of success on the merits of their case. Where the balance of harms weighs heavily in the plaintiffs' favor, and the public interest will not be harmed, the plaintiffs' Motion for a Preliminary Injunction should be granted.

## STATEMENT OF FACTS

In early 2000, plaintiff Anthony Caliendo and the defendant were playing together in a band called "The Mood". (See Affidavit of Anthony Caliendo, ¶ 4. A copy of Mr. Caliendo's Affidavit is attached as Exhibit A). By early 2001, plaintiffs John Pitingolo, Daniel Fisher, and Walter Stickle had joined the band as members. (See Affidavit of Walter Stickle, ¶¶ 2-4, attached as Exhibit B; Affidavit of John Pitingolo, ¶ 2, attached as Exhibit C; and Affidavit of Daniel Fisher, ¶ 3, attached as Exhibit D). The purpose of The Mood was to be a Pink Floyd tribute band. Id.

During the time the plaintiffs played in The Mood, the defendant Orfanos became increasingly difficult with which to work. He arrived late to rehearsals and left early, refused to practice, and started arguments. (See Stickle Affidavit, ¶ 6; A. Caliendo Affidavit, ¶¶ 10-11; J. Pitingolo Affidavit, ¶¶ 3,7; and Fisher Affidavit, ¶¶ 7-8) By May 2001, The Mood began operating under the name "The Pink Floyd Experience," although it had not yet performed under the new name. (See Stickle Affidavit, ¶ 5).

Some of the band members were not happy with the name of the band. In May of 2001, plaintiff Fisher and others expressed concerns to each other about using the name "Pink Floyd" in their band name. (See Fisher Affidavit, ¶ 4). As a result, the band members were discussing renaming the band when plaintiff Pitingolo suggested the name "Pink Void". (J. Pitingolo Affidavit, ¶ 5; A. Caliendo Affidavit, ¶ 9). The plaintiffs all agreed to the suggestion but with a spelling change to "Pink Voyd". (See

2

Stickle Affidavit ¶ 7; Fisher Affidavit ¶ 5).[1] The defendant, however, told the plaintiffs that he hated the name "Pink Voyd." (See J. Pitingolo Affidavit, ¶ 6; A. Caliendo Affidavit, ¶ 9). Orfanos refused to change the name of the band, insisting it operate under the name "The Pink Floyd Experience". Id.

On June 1, 2001, the eve of the band's first performance, the defendant called the band members and the venue to cancel the performance. (See J. Pitingolo Affidavit, ¶ 7; Affidavit of Eamon Tighe, ¶ 7. A copy of Mr. Tighe's Affidavit is attached as Exhibit F). Although the defendant eventually agreed to perform on June 2, 2001, his attitude and the quality of his performance was poor and the plaintiff band members decided they did not want to work with the Orfanos again. (A. Caliendo Affidavit, ¶ 11; Fisher Affidavit, ¶ 8). After the first and only performance under the name "The Pink Floyd Experience", plaintiff Stickle left the band. (Stickle Affidavit, ¶ 8). Shortly thereafter, the other plaintiffs left, and The Pink Floyd Experience broke up. (See A. Caliendo Affidavit, ¶ 12; Fisher Affidavit, ¶ 9).

Over the course of the next month, the plaintiffs began discussions about forming a new band called "Pink Voyd", which would not include the defendant. (See Stickle Affidavit, ¶ 9; A. Caliendo Affidavit, ¶ 12). By July of 2001, the plaintiffs began a new band under the name Pink Voyd and had begun rehearsing together. (Stickle Affidavit, ¶ 10; A. Caliendo Affidavit, ¶ 12; Tighe Affidavit, ¶ 8). The defendant Orfanos had no involvement whatsoever with the formation of the band Pink Voyd, nor did he participate in a single practice or rehearsal of Pink Voyd. Id. (See also J. Pitingolo Affidavit, ¶ 8; Fisher Affidavit, ¶ 9).

In November 2001, the plaintiffs went to set up a website for Pink Voyd and attempted to register the domain name www.pinkvoyd.com. They were shocked to

---

[1] In addition, Major Steven F. Pitingolo recalls his brother John, in the Spring of 2001, telling him that he had come up with the idea of naming the band "Pink Voyd," and asked him what he thought of the idea. (See Affidavit of Major Steven F. Pitingolo, ¶ 2, a copy of which is attached as Exhibit E).

3

discover that Orfanos had already registered this domain name, despite telling the plaintiffs that he hated the name and rejecting it as a new name for The Pink Floyd Experience band. (A. Caliendo Affidavit, ¶ 14; Stickle Affidavit, ¶ 16).

After lengthy discussions, later in November 2001, the defendant agreed to transfer the name "Pink Voyd" and the domain name www.pinkvoyd.com to the plaintiffs. Id. On November 22, 2001, the plaintiffs set up a website for Pink Voyd at www.pinkvoyd.com, and have since continuously operated such website to advertise Pink Voyd and its upcoming concerts. (See A. Caliendo Affidavit, ¶ 15).

The plaintiffs' first performance as Pink Voyd was on April 27, 2002. The plaintiffs have since continued to perform as Pink Voyd, having played over 20 concerts as Pink Voyd in both Massachusetts and New Hampshire. (See Stickle Affidavit, ¶ 11). Pink Voyd has played at a range of venues, including one show before tens of thousands of people at the Boston Marathon on April 21, 2003. Id. at ¶ 12. (See also Joel A. Feingold Affidavit, ¶¶ 2-3, a copy of which is attached as Exhibit G.) The defendant Orfanos has not been involved, in any way, with any of the plaintiffs' concerts or their content. (A. Caliendo Affidavit, ¶ 16. See also, Affidavit of Paul Papetti, ¶ 5, a copy of which is attached as Exhibit H; Affidavit of William Easton, ¶¶ 2-3, a copy of which is attached as Exhibit I; Affidavit of Robert Caliendo, ¶¶ 3-4, attached as Exhibit J; and the Affidavit of Robert Palumbo, ¶¶ 2-10, attached as Exhibit K). The plaintiffs continue to perform as Pink Voyd and currently have a concert scheduled at the Chevalier Theatre in Medford, MA on July 17, 2004. (Stickle Affidavit, ¶ 13).

When the defendant discovered that the plaintiffs had formed a new band under the name Pink Voyd, he became angry and began placing irate phone calls and messages to the plaintiffs. (A. Caliendo Affidavit, ¶ 13). The plaintiffs discovered that Orfanos had registered the user names "pinkv0yd" and "plnkvoyd" with America

4

Online and the domain names www.pinkv0yd.com and www.pinkvoyd.us, and set up a website at www.pinkvoyd.net. (Stickle Affidavit, ¶ 15; A. Caliendo Affidavit, ¶ 18). Using these various false and misleading names and sites, Orfanos has attempted to damage the plaintiffs' band, harm their reputation, and discredit the band with venue operators and others in the music industry.[2] (A. Caliendo Affidavit, ¶¶ 19-20; Stickle Affidavit, ¶ 17; See also, Affidavit of Kristen Piechocki, ¶¶ 1-4. Ms. Piechocki's Affidavit is attached hereto as Exhibit L). Orfanos has, among other false and malicious claims, constructed a homepage similar to the plaintiffs' homepage, published statements that he owns and is the "founder" of Pink Voyd, and that he owns the trademark for the name. Orfanos has also made statements that he is a part of the band Pink Voyd, while the plaintiffs are not. Id. (See also, Affidavit of Mandi Jo Jastremski. Ms. Jastremski's Affidavit is attached hereto as Exhibit M.)

In April of 2004, the defendant applied to register with the United Stated Patent and Trademark Office the service mark "Pink Voyd,"[3] despite his failure to ever perform or advertise under the name. (See copy of Patent and Trademark Application Listing, attached as Exhibit N). Since his application, the defendant has been threatening website owners to remove their links to the plaintiffs' website www.pinkvoyd.com, claiming that the plaintiffs are violating his trademark. (See Piechocki Affidavit, ¶ 4). In May of 2004, Orfanos sent the plaintiffs a letter falsely claiming that he had created Pink Voyd, informing them that he had registered the trademark "Pink Voyd," and demanding that they pay him an out of court settlement for the rights to the mark. (See A. Caliendo Affidavit, ¶ 22. See also Correspondence of Arthur Orfanos, dated May 6, 2004, attached hereto as Exhibit O).

---

[2] For instance, Orfanos has maliciously placed on one of his websites information providing the street address and location of Anthony Caliendo's business, disclosing that Pink Voyd holds its rehearsals there and indicating the high value of equipment stored there. (A. Caliendo Affidavit, ¶ 21).
[3] The defendant filed a trademark application on April 3, 2004. The application has not been reviewed and the plaintiffs are filing an opposition to the application for reasons similar to those stated herein.

5

Furthermore, Orfanos continues his campaign to interfere with the plaintiffs' business relationships and has tried to have their performances cancelled. With respect to Pink Voyd's upcoming concert on July 17, 2004, Orfanos has repeatedly contacted the representatives of the Chevalier Theatre in Medford, insisting that he owns Pink Voyd, and that the Pink Voyd concert at that venue should be cancelled on the grounds that the plaintiffs have no authority to perform as Pink Voyd. (See Affidavit of Warren Scott, ¶ 5, attached hereto as Exhibit P; A. Caliendo Affidavit, ¶ 20). Upon information and belief, the defendant has also contacted the ticket agent, Strawberries, and the radio station WZLX, 100.7 FM, in an effort to interfere with the sale of tickets, sponsorships and advertisements of Pink Voyd concerts. (See Papetti Affidavit, ¶ 6; Stickle Affidavit, ¶¶ 13, 17-19).

If Orfanos is successful in having Pink Voyd's upcoming concert on July 17th cancelled, the plaintiffs will suffer substantial and irreparable harm. Concerned about the defendant's relentless and ongoing efforts to damage their band and business relationships, the plaintiffs now file this action and Motion for Preliminary Injunction.

### STANDARD OF REVIEW

In order to be entitled to a preliminary injunction, a plaintiff must satisfy four criteria: "(1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corporation, 799 F.2d 6, 12 (1st Cir. 1986).

Furthermore, the First Circuit has adopted a "sliding scale" approach to the requirements: when the likelihood of success on the merits is great, the showing of

the other factors is somewhat less. EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996). This is particularly true in the trademark context where "the key issue is the likelihood of success on the merits because the other decisions will flow from that ruling." Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989). Accordingly, the irreparable injury requirement is satisfied when the plaintiff demonstrates that "the defendant is wrongfully trading on the plaintiff's reputation." Camel Hair, 799 F.2d at 14. "The plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief." Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 489, 498 N.E.2d 1044 (1986).

## LAW

### I. The Plaintiffs are Likely to Succeed on the Merits of Their Claims

#### A. The Defendant's Violated the Lanham Act, 15 U.S.C. §1125(a)

The plaintiffs are likely to succeed in their claims against the defendant for violating their right to protection of their unregistered trademark under the Lanham Act, 15 U.S.C. §1125. Section 1125(a) of Title 15 prohibits any person from using:

> in connection with any goods or services, ... any word, term, name, symbol, or device, or any combination thereof, ...which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

The First Circuit in Boston Beer Company v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993) identified a two-step process for determining violations of section 1125(a). The first step is a determination that the unregistered mark qualifies for protection. Id. The general principles used to determine which marks qualify for protection under §1125(a) are the same as those principles used to qualify a mark for

registration under Section 2 of the Lanham Act. Id. The second step is whether the allegedly infringing mark of the defendant is likely to cause consumer confusion. Id.

Initially, trademark and service mark rights are based upon prior use, allowing the person who first uses the mark in connection with a particular line of business greater rights than a junior user. Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 D.2d 812, 815 (1st Cir. 1987). Further, a mark qualifies for trademark protection when it is being used in commerce and is distinctive. A mark is being used in commerce when it is used or displayed in the sale or advertising of services and the services are rendered in more than one State. 15 U.S.C. §1127.

A mark is inherently distinctive when its "intrinsic nature serves to identify a particular source." Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210-211 (2000). Word marks are inherently distinctive when arbitrary ("Camel" cigarettes), fanciful ("Kodak" film), or suggestive ("Tide" laundry detergent). Id. If neither arbitrary, fanciful, nor suggestive, then a mark acquires distinctiveness when it develops a secondary meaning. Id.

The plaintiffs assert protection of the name "Pink Voyd" in connection with their musical group. As an initial matter, the plaintiffs are the senior users to the mark "Pink Voyd." They were the first to suggest the use of it as the name for a musical group. (See Exhibit C, J. Pitingolo Affidavit, ¶¶ 4-6). The plaintiffs were also the first to actually use the name Pink Voyd and perform under that name as a musical group. (See Exhibit B, Stickle Affidavit, ¶¶ 8-11). Furthermore, they have used the mark in commerce since November of 2001. (See A. Caliendo Affidavit, ¶ 15). The plaintiffs have advertised their concerts under the name "Pink Voyd" and have played concerts as Pink Voyd at various locations in Massachusetts and New Hampshire since 2002. Id. (See also Stickle Affidavit, ¶ 11).

Furthermore, the mark Pink Voyd is inherently distinctive. It is neither a generic term (such as "guitar") nor is it a purely descriptive term (such as "deep bowl"). The use of "Pink Voyd" in reference to a musical group serves to identify a particular source. Whether classified as arbitrary, fanciful, or suggestive, the mark "Pink Voyd" is inherently distinctive, qualifying it for trademark protection.

Since the mark "Pink Voyd" is a qualified unregistered mark, then the plaintiffs need only demonstrate that the defendant's allegedly infringing mark is likely to cause confusion with the plaintiffs' mark. There are eight factors to consider when determining the likelihood of confusion: (1) the similarity of the service marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiffs' mark. Boston Athletic Association v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989).

These eight factors were considered in Public Service Co. of New Mexico v. Nexus Energy Software, Inc., 36 F.Supp.2d 436 (D.Mass. 1999), when the court considered the potential for confusion between the plaintiff's mark "Energy Place" and the defendant's mark "eNERGYplace" and "energyplace.com". The court granted a preliminary injunction against the defendant because the similarity of the marks made them look and sound virtually identical, the parties offered similar services, and both companies used the Internet to lure customers. Id. at 439.

The facts of this case likewise establish that there is a probability of confusion if the defendant continues to use the name "Pink Voyd" in the music business. Not only is the defendant using the exact name of the plaintiffs' band, but he is also using it to advertise the same services as the plaintiffs, musical entertainment, to the same prospective consumers, devotees of Pink Floyd music, in the same channels of trade,

the Internet. Simply, the defendant's use of "Pink Voyd" to advertise musical entertainment is likely to cause consumer confusion with the plaintiffs' already established band, Pink Voyd. Having satisfied both steps for establishing a violation of 15 U.S.C. §1125(a), the plaintiffs have demonstrated that they are likely to succeed on the merits of their claim under 15 U.S.C. §1125(a).

Injunctive relief is especially warranted in this case, where the defendant's ongoing use of the name "Pink Voyd" has been of a malicious nature, intending to cause consumer confusion and in the process damage the plaintiffs and their established use of the name. As the defendant's violations of the Lanham Act are clear, and stand to cause the plaintiffs irreparable harm, the plaintiffs' Motion for Preliminary Injunction should be granted.

### B.  The Defendant Violated the Lanham Act, 15 U.S.C. §1125(d)

The plaintiffs are likely to succeed on the merits of their claim against the defendant for his continuing violations of 15 U.S.C. §1125(d). Under Section 1125(d), a person who is not the owner of a mark is prohibited from the following:

> [W]ithout regard to the goods or services of the parties...[he] has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and...registers, traffics in, or uses a domain name that...in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark...

In determining the bad faith intent of a person, a court should consider the many factors outlined in the Code. Those factors include the following:

(I)  the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)  the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

10

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; ...

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by causing a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; ...

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to the marks of others that are distinctive at the time of registration of such domain names...without regard to the goods or services of the parties;

As an initial matter, the plaintiffs are the rightful users of the mark "Pink Voyd".[4] As previously stated, the plaintiffs initially proposed the use of the mark as a musical group name and were the first to perform under the name "Pink Voyd". In sharp contrast, the defendant has never performed under the name "Pink Voyd" or used the name for the purposes of music performance. During his relationship with the plaintiffs as "The Pink Floyd Experience", the defendant outright rejected the name "Pink Voyd". (See J. Pitingolo Affidavit, ¶ 6.)

Furthermore, Orfanos currently has no rights in the mark. Although he has an application pending at the Patent and Trademark Office, the plaintiffs are filing a formal letter of protest with the Office and have asserted claims in this action that he is attempting to procure registration of the mark "Pink Voyd" through false or fraudulent means. Since the defendant is not the senior user of the mark, has not

---

[4] To prevail on a claim under 15 U.S.C. §1125(d), the mark need not be a registered mark. See Int'l Bancorp, LLC v. Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco, 329 F.3d 359 (4th Cir. 2003) cert. denied, Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 157 L. Ed. 2d 891 (2004) (granting relief under 15 U.S.C. 1125(d) to the defendant for its unregistered mark.).

11

obtained registration of the mark, and has not used the mark in commerce, the defendant has no rights to the mark.

Since the plaintiffs are the rightful users of the mark "Pink Voyd", the defendant is liable under §1125(d) if he registered, trafficked in, or used an identical or confusingly similar domain name with a bad faith intent to profit from the mark. The defendant had a bad faith intent to profit from the plaintiffs' name "Pink Voyd". The defendant initially registered www.pinkvoyd.com on or about May 23, 2001.[5] After transferring the name "Pink Voyd" and the domain name www.pinkvoyd.com to the plaintiffs in November, 2001, the defendant subsequently registered the user names "pinkv0yd" and "plnkvoyd," and the domain names www.pinkvoyd.us and www.pinkvoyd.net. Orfanos has never made any bona fide use of these names in the music business, and instead has used them only in an effort to disparage the plaintiffs and their product. Orfanos' registration of such multiple confusingly similar names, after transferring the name "Pink Voyd" to the plaintiffs, and having knowledge that the plaintiffs were actively using that name and website, is incredibly damaging to the defendant and constitutes a clear violation of §1125(d).

Orfanos has also profited from, and continues in his efforts to so profit from, the transfer of domain names and trademark that he has never used or had an intent to use. He has transferred the domain name www.pinkvoyd.com to the plaintiffs only after extensive negotiations. (See Exhibit B, Stickle Affidavit, ¶ 16). Orfanos has also tried to profit from a transfer of the trademark "Pink Voyd" to the plaintiffs. (See Exhibit M). There is clearly a pattern of conduct by Orfanos in this regard, demonstrating his bad faith under §1125(d).

---

[5] That Orfanos registered the domain name www.pinkvoyd.com shortly after he rejected the plaintiffs' idea to use it as their band name only demonstrates Orfanos' bad faith. Relations between Orfanos and the plaintiffs had deteriorated at this point, making it fairly obvious that Orfanos secured the domain name at that time so that he could later use it to harm the plaintiffs, or profit from them. Orfanos certainly never demonstrated an intent to use the name for any other, legitimate purpose.

12

Orfanos has, with his identical or confusingly similar www.pinkvoyd.net website and usernames, obviously intended to divert consumers from the plaintiffs' website with the intent to tarnish and disparage the mark. In this regard, Orfanos has made every effort to create confusion as to the source and sponsorship of the site, falsely stating that he founded and owns Pink Voyd, despite never even being a member of the group. In addition, the defendant has posted pictures of the plaintiffs on his website, claiming they are members of his band and he has published posters created by plaintiff Pitingolo, all without the permission of the plaintiffs. (See J. Pitingolo Affidavit, ¶ 11). Such continuing deceptions by the defendant are intended to disparage the plaintiffs' reputation and mark and infer the plaintiffs' sponsorship.[6]

The factors to determine bad faith set forth in §1125(d) read like a laundry list of Orfanos' conduct, and thus weigh heavily in the plaintiffs' favor. Accordingly, the plaintiffs have demonstrated that they are likely to succeed on the merits of their claim against the defendant for violating 15 U.S.C. §1125(d).

### C. The Defendant Violated the Massachusetts Protection of Trademarks Statute

The plaintiffs also seek a preliminary injunction under the Massachusetts Protection of Trademarks statute, M.G.L. ch. 110B, § 12. Section 12 provides a person with an injunctive remedy when there is a "likelihood of injury to business reputation or of dilution of the distinctive quality of ... a mark valid at common law, or a trade name valid at common law ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." M.G.L. ch 110B, §12.

---

[6] It should also be noted that none of the domain names or usernames registered by Orfanos consist of his legal name or any name by which he is known. The defendant's musical group advertises under the name "The Mood" not "Pink Voyd."

The test for infringement of a common law mark in Massachusetts is the likelihood of consumer confusion as to the source of the services.[7] <u>Visa Service, Inc. v. The State Street Bank & Trust Co.</u>, 1980 U.S. Dist. LEXIS 11620 (D.Mass. 1980), citing <u>Coca-Cola Co. v. Snow-Crest Beverages</u>, 162 F.2d 280, 283 (1st Cir. 1947); <u>see also</u> <u>Planned Parenthood</u>, 398 Mass. 480, 489, 498 N.E.2d 514 (1947)(holding that a "plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief."). The same eight factors considered when determining the likelihood of confusion in federal trademark actions are used to determine Massachusetts common law trademark infringement.

In the instant matter, it is evident that the confusion created by the defendant's actions is likely to cause injury to the plaintiffs' reputation and distinctive quality of their mark. As previously stated in Section I.B., supra, the defendant is disparaging the plaintiffs with his usernames and websites and improperly posting their pictures as members of his band. These actions can only damage the plaintiffs' reputation. Accordingly, the plaintiffs' establishment that there is a likelihood of confusion under 15 U.S.C. §1125(a) in Section I.A., infra, and that the defendant is intentionally attempting to disparage the plaintiffs' reputation through the use of his websites, also establishes that the plaintiffs are likely to succeed in their action under M.G.L. ch. 110B, § 12.[8] Injunctive relief, therefore, is warranted.

---

[7] Although a first federal registrant has presumptive rights to use its mark in connection with the services for which it is certified, Massachusetts has long held that a newcomer may not appropriate even a non-exclusive mark without taking such precautions as would prevent deception with the previous user's goodwill. <u>Visa Service</u>, 1980 U.S. Dist. LEXIS 11620, *33, a copy of which has been attached as Exhibit Q. Moreover, a good faith prior user of a subsequently registered mark "has a complete defense [under common law] to charges of infringement in the area of its established market." <u>Id.</u> Accordingly, the defendant's pending application does not affect the Court's determination of the plaintiffs' right to an injunction.

[8] The same evidence and analysis also demonstrates that the plaintiffs have a likelihood of success on the merits of their common law claims of product disparagement and unfair competition, set forth in Counts II and IV of their Complaint, respectively.

### D. The Defendant is Intentionally Interfering with Lawful Contractual Relations

The plaintiffs also seek a preliminary injunction enjoining the defendant from contacting the vendors, venues, ticket agents, and radio stations involved with the plaintiffs' upcoming concert on July 17, 2004 at the Chevalier Theatre in Medford, MA, and any other concert the plaintiffs may schedule until this action reaches a final judgment.

The elements a plaintiff must prove in an action for intentional interference with contractual relations are as follows: "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991), citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812-817 (1990).

The plaintiffs have lawfully contracted with the Chevalier Theatre for a concert on July 17, 2004. The defendant has contacted the Theatre repeatedly, claiming that the plaintiffs have no right to use the name "Pink Voyd" and insisting that the concert be canceled. Furthermore, the defendant has threatened the ticket agent for the concert, Strawberries, in a similar manner. In addition, the defendant has called WZLX, 100.7 FM, a local radio station sponsoring and advertising the concert, and threatened it, again under the guise that he is the lawful owner of a registered trademark. Such threats are interfering with the lawful rights of the plaintiffs to make contracts in the music business for the performance of their group Pink Voyd, a name under which they have performed more than 20 times in the last three years.

As previously stated, the defendant has no rights to the name "Pink Voyd". Furthermore, his sole intention in threatening the plaintiffs' vendors, ticket agents, and sponsors, is to harm the plaintiffs. Angry with the plaintiffs ever since they left

15

his band The Mood, and formed their own band, Orfanos has embarked on a vindictive campaign to damage the plaintiffs' business relationships through his improper and false communications.

Should the defendant succeed in his threats, the plaintiffs concerts are likely to be cancelled. The plaintiffs' reputation in the music industry stands to be substantially and irreparably harmed in that event. Therefore, injunctive relief to enjoin the defendant from his ongoing efforts to interfere with the plaintiffs' contractual relations is warranted.

## II.     The Plaintiffs will be Irreparably Harmed if a Preliminary Injunction is not Granted

The plaintiffs will be irreparably harmed if the defendant is not enjoined from his wrongful and malicious conduct. Initially, the plaintiffs' likelihood of success on the merits of their federal trademark claims[9] satisfies the irreparable harm requirement for the issuance of a preliminary injunction. See Camel Hair, 799 F.2d at 14; see also I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) ("In the trademark context, irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim.").

Similarly, the plaintiffs will also suffer irreparable harm should an injunction not be granted under the Massachusetts Trademark Protection Statute. As with the federal claims, continuing the permit the defendant to use "Pink Voyd" will allow the defendant to continue disparaging both the plaintiffs' reputation and good will.

Finally, if the defendant is not enjoined from contacting the plaintiffs' vendors, venues, ticket agents, and sponsors, the plaintiffs will suffer irreparable harm. Their reputation will be harmed and their scheduled performances might be cancelled.

Further, other vendors and sponsors will be fearful of contracting with the plaintiffs for performances from concern of receiving the same threats from the defendant.

Accordingly, the plaintiffs have demonstrated that they will suffer irreparable harm if a preliminary injunction is not issued.

### III. The Harm the Plaintiffs Will Suffer if an Injunction is Not Granted Outweighs the Harm to the Defendant in Granting the Injunction

The risk of harm to the plaintiffs if an injunction is not granted vastly outweighs the risk of harm to the defendant if a preliminary injunction is granted. The formal name of the defendant's musical group is "The Mood". The defendant will still be able to advertise his group under its name. There is no need for him to use the name "Pink Voyd" for any legitimate business reason. Moreover, preventing the defendant from operating the domain names www.pinkvoyd.net and www.pinkvoyd.us will not harm the defendant. He is currently using the websites for two purposes: to advertise his band "The Mood" and to disparage the plaintiffs. Neither of these is a legitimate purpose. As stated, Orfanos does not need to use a website entitled "Pink Voyd" to advertise a band called "The Mood". In addition, the continued disparaging of the plaintiffs serves no other purpose than to harm the plaintiffs. Preventing the defendant from those actions would thus cause no harm whatsoever to the defendant.

Furthermore, enjoining the defendant from contacting the plaintiffs vendors, venues, ticket agents, and sponsors regarding Pink Voyd also will not cause the defendant any harm. The defendant has no demonstrable need to contact these businesses regarding Pink Voyd. He is not doing so to trying to schedule a performance of his own band, or otherwise further his business interests. Orfanos is solely attempting to disrupt the performances of the plaintiffs and cause them harm.

---

[9] Sections I.A. and I.B., infra.

17

The defendant does not stand to be harmed in any sense by the issuance of an injunction here.

Conversely, continuing to permit the defendant to use and advertise the name "Pink Voyd" will substantially harm the plaintiffs' goodwill and reputation. The defendant's threats to the plaintiffs' vendors, venues, ticket agents, and sponsors are harming both the plaintiffs' goodwill and reputation. Further, permitting those threats to continue may result in further economic harm to the plaintiffs in lost ticket sales and performances. The balance of harms thus weighs completely in the plaintiffs' favor.

### IV.   The Public Will Not Suffer Harm if an Injunction is Granted

Finally, there will be no harm to the public interest if this preliminary injunction is granted. The trademark laws are intended to protect the interests of the public by preventing deception and confusion caused by the bad faith use of marks and registration of domain names. In contrast, no public interest is served by allowing a person to use another's distinctive mark for his own profit or permitting him to disparage another on a website with a confusingly similar domain name. In this case, the defendant can point to no public interest that is served by allowing him to continue to disseminate confusing and false information concerning the plaintiffs' musical group. Quite conversely, the issuance of a preliminary injunction in this matter will benefit the public interest by putting a stop to this wrongful and destructive conduct.

### CONCLUSION

The plaintiffs have established that they are entitled to a preliminary injunction. They have established a likelihood of success on their claims under 15 U.S.C. §1125(a)

and (d), the Massachusetts Trademark Protection Statute, and the common law tort of intentional interference with contractual relations. The plaintiffs have also established that they will suffer irreparable harm if an injunction is not issued and that the balance of hardships weighs completely in their favor. Finally, the plaintiffs have established that the public interest will suffer no harm if a preliminary injunction is granted. Accordingly, the plaintiffs respectfully request that their Motion for Preliminary Injunction be granted.

Respectfully submitted,

**CLARK, HUNT & EMBRY**

William J. Hunt (244720)
Michael B. Newman (632222)
Mandi Jo Jastremski (657349)
55 Cambridge Parkway
Cambridge, MA 02142
(617) 494-1920